## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA,
    Plaintiff,

        v.

KURT BAUER,
    Defendant.

Civil Action No.

(_____, J.)

## COMPLAINT

The United States of America, acting through the United States Attorney for the Middle District of Pennsylvania, brings this civil action against Kurt Bauer for causing the submission of fraudulent claims to the United States for payment.  In 2008, the United States Department of Health and Human Services excluded Bauer from participation in Medicare, with the "practical effect" of "preclud[ing his] employment . . . in any capacity by a health care provider that receives reimbursement, indirectly or directly, from [Medicare]."  Nonetheless, Bauer continued to serve as a *de facto* executive and administrator of Leader Heights Healthcare while the company submitted Medicare claims.  Because these Medicare claims violated the False Claims Act and common law, the United States asks that the Court grant monetary relief for the violations.

In support thereof, the United States alleges as follows:

## JURISDICTION AND VENUE

1.     This action is brought by the United States under the False

Claims Act, 31 U.S.C. §§ 3729 *et seq.*, and at common law.

2.     This Court has subject matter jurisdiction over this action

pursuant to 28 U.S.C. §§ 1331, 1345, and supplemental jurisdiction

pursuant to 28 U.S.C. § 1367(a).

3.     This Court has personal jurisdiction over Defendant Kurt

Bauer pursuant to 31 U.S.C. § 3732(a).  At all times relevant to this

Complaint, Defendant Bauer transacted business within the Middle

District of Pennsylvania, and the illegal conduct he engaged in occurred

within this District.

4.     Venue is proper in this District pursuant to

31 U.S.C. § 3732(a) and 28 U.S.C. § 1391(b)-(c), as Defendant resides in,

transacts business, and committed the acts at issue in this District.

## PARTIES

5.     The Plaintiff is the United States of America, suing on

behalf of the United States Department of Health and Human Services

(HHS), which is the federal agency that administers and supervises the Medicare program.

6.     Defendant Kurt Bauer resides in York, Pennsylvania.  Prior to his exclusion from Medicare, Bauer had owned Leader Heights Healthcare, P.C. (Leader Heights).  Leader Heights is a professional corporation organized and existing in Pennsylvania that provides medical and chiropractic care in York, Pennsylvania.  The business was formerly named ChiroCare Center, P.C. (*a.k.a.* ChiroCenter).  Leader Heights is currently owned by Dr. Kimberly Carozzi and Dr. Earl Edwards.  As discussed below, Bauer remained an administrator and employee of Leader Heights even after he was excluded from Medicare.

## THE MEDICARE PROGRAM

7.     Medicare is a federal program administered by the Centers for Medicare and Medicaid Services, a federal agency within HHS, to pay for the costs of certain health care services provided to eligible individuals.  Individual entitlement to Medicare is largely based on age, disability, or affliction with end-stage renal disease.  42 U.S.C. §§ 426, 426-1.

8.     One piece of the Medicare program is Medicare Part B, which covers the costs of certain medical and other health services, such as physician services, laboratory services, and outpatient therapy.

9.     Medicare enters into agreements with health care providers and suppliers that establish their eligibility to participate in the program and receive reimbursement.  In order to be eligible for payment, providers must certify that:

> I agree to abide by the Medicare laws, regulations and program instructions that apply . . . . The Medicare laws, regulations, and program instructions are available through the Medicare contractor.  I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the supplier's compliance with all applicable conditions of participation in Medicare.

CMS Form 855.  Leader Heights re-certified its compliance in December 2009.

10.     The United States reimburses Medicare providers with federal funds from the Medicare Trust Fund, through CMS, as supported by American taxpayers.  CMS contracts with Medicare Administrative Contractors (*a.k.a.* fee-for-service contractors) to act on

its behalf in reviewing, approving, and paying Medicare bills, called "claims," received from providers like Leader Heights.  For providers located within Pennsylvania, the Contractor is Novitas Solutions, formerly Highmark Medicare Services.  Novitas conducts business in Camp Hill, Pennsylvania.

11.    Payments are typically made directly to providers like Leader Heights, rather than to the patient.

12.    At all times relevant to this Complaint, Leader Heights, under its current and former names, has participated as a provider in the Medicare Part B program and provided Medicare Part B-covered services.  It has submitted claims and received payments from Medicare as reimbursement for services provided.

## EXCLUSION FROM MEDICARE

13.    The Office of Inspector General (OIG) for HHS was established to identify and eliminate fraud, waste, and abuse in HHS's programs, including Medicare.  In furtherance of this mission, OIG has the delegated authority to exclude individuals and entities who have engaged in certain types of misconduct from participation in Medicare and other federal health care programs.  *See* 42 U.S.C. § 1320a-7.

14.    The effect of an OIG exclusion is that no Medicare payment may be made for any items or services furnished by an excluded individual or entity.  42 U.S.C. § 1395y(e)(1)(A); 42 C.F.R. § 1001.1901. Any items and services furnished by an excluded individual or entity are not reimbursable under federal health care programs, including Medicare.  This prohibition applies even when the federal payment itself is made to another provider, practitioner, or supplier that is not excluded.

15.    In addition, no federal program payment may be made to cover an excluded individual's salary, expenses, or fringe benefits, regardless of whether they provide direct patient care.

16.    The prohibition against payment for items or services furnished by excluded individuals or entities extends beyond simply whether they provided treatment.  As a part of reimbursing a provider for each claim, Medicare also reimburses for services not directly related to patient care, but that are a necessary component of providing items and services to federal program beneficiaries.

17.    Medicare-covered items and services include "administrative and management services."  42 C.F.R. § 1001.1901; 62 Fed. Reg. 47182,

47187 (Sept. 8, 1997) ("The addition of this language would serve to more clearly define what an excluded individual or entity can do, and would codify and re-enforce existing OIG policy that is currently contained in the exclusion notice letters sent to individuals and entities.").

18.    OIG elaborated on this prohibition in a Special Advisory Bulletin to the public in September 1999 entitled, "The Effect of Exclusion From Participation in Federal Health Care Programs." 64 Fed. Reg. 52791-02, *available at* http://oig.hhs.gov/exclusions/effects_of_exclusion.asp. This Bulletin describes exclusion and its impact on billing in detail. The 1999 Bulletin notified providers that the "prohibition against Federal program payment for items or services furnished by excluded individuals or entities also extends to payment for administrative and management services," and that providers have "an affirmative duty" to determine whether individuals or entities are excluded prior to employing them. Taken as a whole, "the practical effect of an OIG exclusion is to preclude employment of an excluded individual in any

capacity by a health care provider that receives reimbursement, indirectly or directly, from any Federal health care program."

19.   OIG released an update to the 1999 Bulletin to the public on May 8, 2013, *available at* http://oig.hhs.gov/exclusions/files/sab-05092013.pdf.  This Updated Bulletin reemphasized the guidance in the 1999 Bulletin and provided additional clarifications.  In addition to reminding providers of the consequences of employing excluded individuals, the Updated Bulletin emphasized that "an excluded individual may not serve in an executive or leadership role . . . ." Failure to comply with the rules of exclusion "may lead to criminal prosecutions or civil actions . . . . An excluded person may be civilly liable under the False Claims Act for knowingly presenting or causing to be presented a false or fraudulent claim for payment."

20.   Since at least 1999, OIG has maintained a web site that allows the public, including providers, to check the exclusion status of any individual by name.  *See* http://exclusions.oig.hhs.gov/

## EXCLUSION OF BAUER

21.   Kurt Bauer is a chiropractor who had been granted a license to practice by the Pennsylvania Department of State.

22.   On January 30, 2008, the Pennsylvania Department of

State, through the State Board of Chiropractic, found that Bauer had

> engaged in sexual activity with a patient during
> the chiropractor-patient relationship [o]ver a
> period of approximately five weeks . . . . Sexual
> activity with a patient breaks this trust and takes
> advantage of the disparity in power between a
> chiropractor and patient.  The Board's regulation
> prohibiting sexual activity with a patient is a
> very bright line boundary in his professional
> practice that [Bauer] repeatedly crossed.  His
> actions were extremely serious violations of his
> obligations as a licensed chiropractor.

The Board therefore revoked Bauer's chiropractor license effective

February 29, 2008.  A copy of the decision was mailed to Bauer's

attorney on January 30, 2008.  As of the date of this filing, Bauer's

chiropractor license is still publicly listed as being in "Revocation"

status.[1]

23.   The Board's order revoking Bauer's license resulted in a

number of collateral consequences.  Effective June 19, 2008 and acting

pursuant to 42 U.S.C. § 1320a-7(b)(4), OIG excluded Bauer "from

---

[1] Bauer's license had also been revoked in 1990 based upon his guilty
plea to one count of indecent assault, "result[ing] from an incident
which occurred during the course of Petitioner's chiropractic
examination of an 18-year-old female patient," according to the
Pennsylvania Department of State.

participation in any capacity in the Medicare, Medicaid, and **all** Federal health care programs as defined in section 1128B(f) of the Social Security Act . . . ." As of the date of this filing, Bauer is still publicly listed on OIG's website as being excluded from participation in Medicare.

24.    Bauer had notice of the exclusion.  OIG notified Bauer of the exclusion by mailing the notice to his home address.  Bauer's exclusion was, and continues to be, posted on OIG's publicly available website, and a simple search on the website would have easily exposed the exclusion.  Knowledge of his license revocation also gave Bauer reason to suspect he was excluded, given OIG's authority to do so in such circumstances and his prior exclusion under the same statutory authority.  Bauer demonstrated knowledge of this prior exclusion when he applied to the OIG for reinstatement, which was granted in 2003.

25.    In addition, acts taken by Bauer indicate his awareness of the exclusion.  For example, while Bauer remained involved in the Leader Heights business, he falsely informed Medicare that he had "[r]etired" and failed to inform of his exclusion, as required.

26.     By letter dated May 30, 2008, OIG informed Bauer that

exclusion resulted in him being

> prohibited from submitting or causing claims to
> be submitted to Federal health care programs for
> items or services which you provide, <u>and</u> you are
> also prohibited from being employed to provide
> items or services which are billed to a Federal
> health care program.  Such items or services
> could include administrative, clerical, and other
> activities that do not directly involve patient care
> or the provision of any health care related
> services. . . .
>
> Generally speaking, with rare exceptions, you
> may not be employed by a[n] institutional
> provider that participates in Federal health care
> programs.

## TRANSFER OF OWNERSHIP OF LEADER HEIGHTS

27.     Prior to the 2008 license revocation and the exclusion

resulting from Bauer's alleged sexual improprieties, Bauer had owned

and operated Leader Heights under its former name, ChiroCare Center,

P.C. (*a.k.a.* ChiroCenter), which provided chiropractor services in York,

Pennsylvania.

28.     Perhaps as a result of the exclusion effective June 19, 2008,

Bauer notified the Medicare Contractor that he had "[r]etired" effective

March 5, 2008, and the notification indicated that the practice was now

owned by David Santoriello as of March 5, 2008.  Bauer did not report

the revocation of his license, nor his exclusion from participation in any Federal health care program, as required by his enrollment agreement with CMS.

29.    Despite his representation to the Contractor, Bauer retained ownership of Leader Heights until he sold it to Dr. Carozzi in 2009.

30.    In 2010, the Medicare Contractor was notified that ChiroCare was now named Leader Heights Healthcare, P.C.  However, other identifiers, including the tax identification number, stayed the same.  Ultimately, the Leader Heights entity continued with a name change and an additional owner, Dr. Earl Edwards.

## BAUER'S CONTINUED INVOLVEMENT IN LEADER HEIGHTS

31.    Despite having been excluded and informing Medicare that he had "[r]etired," Bauer remained involved in Leader Heights as a manager, administrator, and *de facto* executive.

32.    From the date of his exclusion until he sold the business to Dr. Carozzi in 2009, Bauer retained sole ownership of Leader Heights, despite his exclusion.

33.    Since his exclusion and until late 2013, Bauer retained authority over much of the business operations of Leader Heights,

including management and administration.  He was a decision maker in these areas, and employees of Leader Heights considered him as such.

34.   Bauer stayed involved in Leader Heights's business with respect to human resources.  Bauer interviewed, made recommendations on hiring and firing, acted as a liaison with applicants for employment with Leader Heights, posted open positions online, and advised on wording of contracts and vacation time for employees.  At least one employee tendered a resignation to Bauer.

35.   Bauer was involved in other administrative and management tasks at Leader Heights.  For example, he remained involved in scheduling of patients.  He also acted as a corporate liaison in negotiating and communicating with companies with which Leader Heights had financial relationships, such as a vendor and advertisers.

36.   Bauer was repeatedly responsible for providing strategic advice and advising Leader Heights employees on how to properly bill insurers, including Medicare.  For example, he advised on billing issues that came up and changes in policies.

37.   Another part of his role was advertising.  Bauer, on several occasions, acted as a spokesperson for Leader Heights.  For example, he

held weekly advertising seminars that promoted Leader Heights's services at the company's offices.  Bauer's name also appeared in advertisements for Leader Heights through other means, including the internet.  *See, e.g.*, https://twitter.com/drkurtbauer/

38.  Bauer was heavily involved in the information technology operations of the company.  For example, he acted as an IT support person for the company, was heavily involved in the company's electronic health records installation, and worked with the vendor of software that Leader Heights used to make changes and improvements to their software.

39.  Bauer purchased supplies for Leader Heights, including medication used by the company.  He was also involved in purchasing equipment for the company, such as a fluoroscopy unit and ultrasound machine.

40.  In addition to the above, Bauer's involvement in the management and administration of Leader Heights included facilitating staff meetings, holding one-on-one meetings with staff members, and overseeing construction.

41.   Bauer was repeatedly held out as an employee of Leader Heights through, *inter alia*, his control of a corporate email account and his advertising seminars.

42.   Bauer also had control over the Leader Heights financial accounts and funds.  For example, he signed payroll checks on behalf of the business, had a corporate debit card, cosigned loans, and he regularly interacted with the company's bank.  Those interactions with the bank included instructions to, for example, increase the limit on the corporate debit card and issue new corporate debit cards to himself and Dr. Carozzi, change the password for his internet login to view the corporate financial accounts, and transfer money from the company's line of credit to its checking account.

43.   Leader Heights reimbursed Bauer for expenses with funds it received from Medicare.  In addition, Bauer made personal loans to the company of approximately $300,000, and Leader Heights repaid Bauer on those loans between 2010 and 2012.

44.   Bauer and his wife received rent payments from Leader Heights with funds Leader Heights received from Medicare that exceeded the amount set in the lease agreement, possibly as a means of

compensating Bauer for the services he provided to Leader Heights. Bauer also received other payments from the company for, *inter alia*, a non-compete agreement, the sale of his ownership interest in Leader Heights, and potentially excessive payments made nominally to his wife.

### FALSE CLAIMS CAUSED TO BE SUBMITTED TO MEDICARE BY KURT BAUER

45.    By continuing to act as an employee, administrator, and executive that supported Leader Heights's business in serving Medicare clients in violation of his exclusion, Bauer caused Leader Heights to submit claims and receive reimbursement from Medicare for Bauer's services.

### Claims Submitted by Leader Heights to Medicare

46.    For services provided between June 19, 2008 and August 26, 2013,[2] Leader Heights (and ChiroCare) received approximately $3 million in funds from Medicare.

47.    The following chart provides examples of claims submitted by Leader Heights during this time period.[3]

---

[2] The United States determined the following numbers and claims data by searching Medicare claims paid to the Leader Heights tax identification number.

| Example Claim Number | Date of Service | CPT Code | Description | Amt. Paid |
|---|---|---|---|---|
| 1 | 11/24/2008 | 98941 | CHIROPRACTIC MANIPULATIVE TREATMENT (CMT); SPINAL, 3-4 REGIONS | 25.73 |
| 2 | 09/15/2009 | 98941 | CHIROPRACTIC MANIPULATIVE TREATMENT (CMT); SPINAL, 3-4 REGIONS | 26.54 |

---

[3] For the example claims, all procedures/services (CPTs) billed for a single beneficiary on a single date of service are grouped together. Any procedures/services that do not have an example claim number or date of service correspond to the prior claim number and date of service listed above them.

| | | | | |
|---|---|---|---|---|
| 3 | 09/15/2010 | 64450 | INJECTION, ANESTHETIC AGENT; TRIGEMINAL MERVE, ANY DIVISION OR BRANCH, OTHER PERIPHERAL NERVE OR BRANCH | 193.07 |
| | | 64450 | INJECTION, ANESTHETIC AGENT; TRIGEMINAL MERVE, ANY DIVISION OR BRANCH, OTHER PERIPHERAL NERVE OR BRANCH | 154.46 |
| | | 97012 | APPLICATION OF A MODALITY  TO 1 OR MORE AREAS; TRACTION, MECHANICAL | 11.95 |
| | | G0283 | ELECTIRCAL STIMULATION (UNATTENDED), TO ONE OR MORE AREAS FOR INDICATION(S) OTHER THAN WOUND CARE, AS PART OF A THERAPY PLAN OF CARE | 9.61 |
| 4 | 11/24/2011 | E0720 | TRANSCUTANEOUS ELECTRICAL NERVE STIMULATION (TENS) DEVICE, TWO LEAD, LOCALIZED STIMULATION | 275.73 |
| | | E0731 | E0731 - FORM FITTING CONDUCTIVE GARMENT FOR DELIVERY OF TENS OR NMES (WITH CONDUCTIVE FIBERS SEPARATED FROM THE PATIENT'S SKIN BY LAYERS OF FABRIC) | 299.32 |

| | | | | |
|---|---|---|---|---|
| | | E0731 | E0731 - FORM FITTING CONDUCTIVE GARMENT FOR DELIVERY OF TENS OR NMES (WITH CONDUCTIVE FIBERS SEPARATED FROM THE PATIENT'S SKIN BY LAYERS OF FABRIC) | 299.32 |
| 5 | 11/25/2011 | 97012 | APPLICATION OF A MODALITY  TO 1 OR MORE AREAS; TRACTION, MECHANICAL | 9.40 |
| | | 97150 | THERAPEUTIC PROCEDURE(S), GROUP (2 OR MORE INDIVIDUALS) | 12.69 |
| | | 98941 | CHIROPRACTIC MANIPULATIVE TREATMENT (CMT); SPINAL, 3-4 REGIONS | 27.38 |
| | | 99211 | OFFICE OR OTHER OUTPATIENT VISIT FOR EVALUATION AND MANAGEMENT OF AN ESTABLISHED PATIENT, WHICH  MAY NOT REQUIRE THE PRESENCE OF A PHYSICIAN | 13.04 |
| | | G0283 | ELECTIRCAL STIMULATION (UNATTENDED), TO ONE OR MORE AREAS FOR INDICATION(S) OTHER THAN WOUND CARE, AS PART OF A THERAPY PLAN OF CARE | 7.60 |

| | | | | |
|---|---|---|---|---|
| 6 | 03/09/2012 | 64450 | INJECTION, ANESTHETIC AGENT; TRIGEMINAL MERVE, ANY DIVISION OR BRANCH, OTHER PERIPHERAL NERVE OR BRANCH | 363.17 |
| | | E0849 | TRACTION EQUIPMENT, CERVICAL, FREE-STANDING STAND/FRAME, PNEUMATIC, APPLYING TRACTION FORCE TO OTHER THAN MANDIBLE | 442.81 |
| 7 | 04/25/2013 | 95886 | NEEDLE ELECTROMYOGRAPHY, EACH EXTREMITY, WITH RELATED PARASPINAL AREAS, WHEN PERFORMED, DONE WITH NERVE CONDUCTION, AMPLITUDE AND LATENCY/VELOCITY STUDY; COMPLETE, FIVE OR MORE MUSCLES STUDIED, INNERVATED BY THREE OR MORE NERVES OR FOUR OR MORE SPINAL LEVELS | 62.43 |
| | | 95887 | NEEDLE ELECTROMYOGRAPHY, NON-EXTREMITY (CRANIAL NERVE SUPPLIED OR AXIAL), MUSCLE(S) DONE WITH NERVE CONDUCTION AMPLITUDE AND LATENCY/VELOCITY STUDY; | 52.35 |

| 8 | 08/22/2013 | 20605 | ARTHROCENTESIS, ASPIRATION AND/OR INJECTION IMTERMEDIATE JOINT OR BURSA | 49.95 |
|---|---|---|---|---|
| | | 76942 | ULTRASONIC GUIDANCE FOR NEEDLE PLACEMENT (EG, BIOPSY, ASPIRATION, INJECTION, LOCALIZATION DEVICE), IMAGING SUPERVISION AND INTERPRETATION | 151.13 |
| | | J3301 | INJECTION, TRIAMCINOLONE ACETONIDE | 2.77 |

48.     In total, Leader Heights received payment on 18,147 claims[4]

it submitted to Medicare for payment between June 19, 2008 and

August 26, 2013, with the intention that Medicare would act upon the

claims by reimbursing Leader Heights.

---

[4] The United States calculated a "claim" by counting all procedures/services billed for a single beneficiary on a single date of service as a "claim."

<u>Leader Heights Claims Submitted to Medicare were<br>Materially False and Damaged Medicare</u>

49.   For all of these claims,

> [n]o payment may be made [from Medicare] with
> respect to any item or service (other than an
> emergency item or service . . . ) furnished—
>    (A) by an individual or entity during the period
> when such individual or entity is excluded
> pursuant to section 1320a-7 . . . of this title from
> participation in [Medicare] . . . .

42 U.S.C. § 1395y(e)(1)(A); *see also* 42 C.F.R. § 1001.1901(b)(1).

50.   For many or all of the Medicare claims that Leader Heights

submitted, Medicare reimbursed the company for the administrative

and management services provided by Bauer, in violation of 42 U.S.C. §

1395y(e)(1)(A), 42 C.F.R. § 1001.1901(b)(1), and other applicable laws,

rules, regulations, and policies.

51.   Had HHS been aware of these facts, the federal agency

would not, and could not, have reimbursed Leader Heights for many or

all of the claims Leader Heights submitted, and the program was

damaged as a result.

52.   By submitting these claims seeking reimbursement for

services provided by Bauer during his exclusion, many or all of the

claims that Leader Heights submitted to Medicare for payment were false and fraudulent.

<u>Kurt Bauer Knowingly Caused the False Claims to be Submitted</u>

53.   Kurt Bauer knew that Leader Heights submitted claims to Medicare during the period of his exclusion.  Bauer had actual knowledge of the claims' falsity, acted in deliberate ignorance of the truth or falsity of the claims, and/or acted in reckless disregard of the truth or falsity of the claim.  He nonetheless remained involved in the Leader Heights business.

54.   OIG sent Bauer multiple letters notifying him of his exclusion from Medicare, and his exclusion was publicly listed online, thereby providing him notice that the Medicare claims submitted by Leader Heights were false.  In addition, as discussed above, knowledge of his license revocation also gave Bauer reason to suspect he was excluded, given OIG's authority to do so in such circumstances and his prior exclusion under the same circumstances.

55.   Bauer's conduct also indicates knowledge of his exclusion and the impermissibility of his involvement in the business.  For example, Bauer attempted to conceal his involvement in the Leader

23

Heights business from Medicare by informing the Medicare Contractor that he was "[r]etired" and failing to inform of his exclusion.

56. Even if Bauer did not have actual knowledge of the exclusion, he was deliberately ignorant of the exclusion and acted in reckless disregard by continuing in the Leader Heights business despite the fact that his exclusion was publicly available information. *See* http://exclusions.oig.hhs.gov/

57. In addition, the OIG letters and publicly available guidance from OIG specifically advised Bauer that he could not retain involvement in Leader Heights as he did without violating his exclusion and causing the submission of false claims.

58. As discussed above, Bauer repeatedly had the responsibility of determining how Leader Heights should bill Medicare and other insurers. Billing requirements came within the scope of his duties as an agent of Leader Heights. Bauer was aware and/or had reason to know of his exclusion, and, because that information is material to the propriety of billing Medicare and within the scope of his assigned duties at the company, Bauer, in his role as providing billing guidance, was

aware and/or had reason to know that he was causing the submission of false claims by Leader Heights.

59.   Bauer never informed Medicare or the Contractor of his involvement in the Leader Heights business.

60.   When the United States deposed Bauer about his knowledge through a Civil Investigative Demand, Bauer repeatedly asserted his Fifth Amendment rights against self-incrimination.

61.   Bauer's involvement in the Leader Heights business caused the Leader Heights Medicare claims to be false and fraudulent.

## THE FALSE CLAIMS ACT & COMMON LAW CLAIMS

62.   The False Claims Act currently provides, in part, that "any person who (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval . . . is liable to the United States Government for a civil penalty of not less than [$5,500] and not more than [$11,000] . . . plus 3 times the amount of damages which the Government sustains because of the act of that person."  31 U.S.C. § 3729(a)(1)(A), *amended by* 28 C.F.R. § 85.3.

63.   Prior to its revision by the Fraud Enforcement and Recovery Act of 2009 (FERA), the False Claims Act imposed liability on "[a]ny

person who (1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval . . . ."  31 U.S.C. § 3729(a)(1) (2008).

64.   To show that a person or entity acts "knowingly" under the False Claims Act, the United States must prove that the person or entity, with respect to that information: (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information.  The United States does not have to prove that the entity had the specific intent to defraud the United States.  31 U.S.C. § 3729(b), *amended by* 31 U.S.C. § 3729(b)(1).

65.   The United States may also pursue civil common law claims for health care fraud offenses.

## COUNT I – FALSE CLAIMS ACT, 31 U.S.C. § 3729(a)(1)

66.     The United States incorporates by reference paragraphs 1-65 as if fully set forth herein.

67.     Defendant Kurt Bauer, due to his providing reimbursable services while he was excluded from Medicare, knowingly caused the presentment of false and fraudulent claims for payment or approval to Medicare in violation of 31 U.S.C. § 3729(a)(1) (pre-2009 amendments) and 31 U.S.C. §3729(a)(1)(A) (current version of False Claims Act), upon Leader Heights's submission of all or some Medicare claims for dates of service since June 19, 2008.

68.     By virtue of these false and/or fraudulent claims, the United States suffered damages and therefore is entitled to treble damages under the False Claims Act, to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each false claim submitted.

## COUNT II – PAYMENT UNDER MISTAKE OF FACT

69.     The United States incorporates by reference paragraphs 1-68 as if fully set forth herein.

70.     This is a claim for the recovery of monies paid by the United States to Leader Heights as a result of mistaken understandings of fact.

71.    The false claims which Defendant Bauer caused to be submitted to the United States' agents were paid by the United States based upon mistaken or erroneous understandings of material fact.

72.    The United States, acting in reasonable reliance on the truthfulness of Leader Heights's claims and the truthfulness of the certifications and representations, paid Leader Heights certain sums of money to which it was not entitled, and Defendant Bauer caused the falsity of those claims.  Defendant Bauer is therefore liable to account and pay such amounts, which are to be determined at trial, to the United States.

## COUNT III – COMMON LAW FRAUD

73.    The United States incorporates by reference paragraphs 1-72 as if fully set forth herein.

74.    Defendant Bauer caused material and false representations in Leader Heights's submission of claims to the United States, with knowledge of their falsity or reckless disregard for their truth, with the intention that the United States act upon the misrepresentations to its detriment.  The United States acted in justifiable reliance upon

misrepresentations Defendant caused Leader Heights to make by causing payments on the false claims.

75.    Had the true facts been known to the United States, Leader Heights would not have received payments for the false and fraudulent claims.

76.    By reason of these payments, the United States has been damaged in an amount to be determined at trial.

## COUNT IV – UNJUST ENRICHMENT

77.    The United States incorporates by reference paragraphs 1-76 as if fully set forth herein.

78.    This is a claim for the recovery of monies by which Defendant Bauer has been unjustly enriched.

79.    By directly or indirectly obtaining government funds to which he was not entitled, Defendant Bauer was unjustly enriched and liable to account and pay such amounts, or the proceeds therefrom, which are to be determined at trial, to the United States.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff United States of America requests that judgment be entered in its favor and against Defendant Bauer as follows:

1.     On the First Count under the False Claims Act: for the amount of the United States' damages, trebled as required by law, and such civil penalties as are required by law, together with all such further relief as may be just and proper.

2.     On the Second and Fourth Counts, for payment under mistake of fact and unjust enrichment: for the damages sustained and/or amounts by which the Defendant was unjustly enriched or by which Defendant retained illegally obtained monies, plus interest, costs, and expenses, and all such further relief as may be just and proper.

3.     On the Third Count, for common law fraud: for compensatory and punitive damages in an amount to be determined, together with costs and interest, and for all such further relief as may be just and proper.

4.     Such further relief as the Court deems just and proper.

Respectfully submitted,

PETER J. SMITH
United States Attorney

 /s/ Anthony D. Scicchitano
ANTHONY D. SCICCHITANO
Assistant U.S. Attorney
PA 208607
U.S. Attorney's Office
228 Walnut Street, Suite 220
P.O. Box 11754
Harrisburg, PA 17108-1754
Phone: (717) 221-4482
Fax:     (717) 221-2246
anthony.scicchitano@usdoj.gov

Date: August 26, 2014